134 Cal.Rptr.2d 670 (2003)
109 Cal.App.4th 313
The PEOPLE, Plaintiff and Respondent,
v.
Darryl Eugene RANDLE, Defendant and Appellant.
No. A097168.
Court of Appeal, First District, Division One.
May 30, 2003.
Review Granted August 27, 2003.
*671 Matthew Zwerling, Executive Director and J. Bradley O'Connell, First District Appellate Project, for Plaintiffs and Appellants.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Stan M. Helfman, Supervising *672 Deputy Attorney General, Amy Haddix, Deputy Attorney General, for Defendant and Respondent.
MARGULIES, J.

I. INTRODUCTION
Defendant Darryl Eugene Randle was convicted of second degree murder (Pen. Code, § 187),[1] and automobile burglary (§ 459). The jury found gun use allegations (§ 12022.5) true as to both charges. On appeal, defendant contends the trial court erred in refusing to instruct the jury on imperfect defense of another. We agree and, finding the error prejudicial, reverse the judgment convicting defendant of second degree murder. For the benefit of the court on remand, we also find that the use of section 246.3 (grossly negligent discharge of a firearm) as the predicate felony for felony murder does not violate the merger doctrine set out in People v. Ireland (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 and People v. Hansen (1994) 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022. Because we reverse the judgment of conviction, we do not reach the remaining issues raised by defendant.

II. FACTUAL AND PROCEDURAL BACKGROUND
In the early morning hours of July 15, 1999, defendant and his cousin, Byron W., broke into a car parked in front of the victim, Brian Robinson's, house. Defendant was 18 years old; Byron 17. The car belonged to Robinson's cousin, Charles Lambert. Lambert lived with Robinson and Robinson's parents.
Defendant was inside Lambert's car when Robinson drove up with a friend. The lights of the car Robinson was in shone directly into Lambert's car and revealed defendant, in the act of burglarizing Lambert's car. Robinson got out and confronted defendant. Defendant testified Robinson said he was going to "beat your ass." Defendant backed away and Robinson followed, reaching for his hip. Defendant was carrying a .25 caliber pistol in his pocket. He shot the gun into the air several times. Robinson threw the contents of a bottle or a glass at defendant. Both defendant and his cousin Byron then ran from the scene. Defendant testified he heard Robinson shout something about getting a gun himself. As they ran, defendant heard two loud bangs behind them. Byron testified he heard gunshots when he ran away.
Robinson went into his house and roused Lambert. The two men got into a truck and pursued defendant and Byron. At the intersection of Greenly and Edwards, Robinson and Lambert spotted Byron.
Robinson and Lambert grabbed Byron and began to beat him. Robinson first hit Byron in the face with his fists. Lambert then hit him several times with his fists. Byron fell to the ground between a guardrail along the side of the road and a fence that bordered a school. Lambert continued to hit Byron and Robinson kicked him.
Lambert testified the beating lasted for about five or ten minutes. Throughout, Byron shouted for help. Byron testified Lambert and Robinson stomped on his head and chest. He thought he was going to die. He "blanked out a couple times." He was injured on his face, his nose was "busted," and a tooth was loosened. The beating left him with scars above his eye and on the bottom of his chin.
Sharalyn Lawrence and Jennifer Wellington, hearing angry voices and someone yelling for help, observed the beating from the upstairs window of Lawrence's house. *673 They saw a man on the ground and two men beating him up. Lawrence told the 911 operator, "[Y]ou better send an ambulance," because the man on the ground was "gettin' his ass kicked."
While the women were on the telephone with the 911 operator, Lambert and Robinson got back into the truck. A moment later, however, Robinson jumped back out. He approached Byron and began to beat him again. Lambert tried to get Robinson to come with him in the truck and, when he failed, drove away.
In the meantime, defendant, who had successfully evaded Robinson and Lambert, discovered Byron was not with him and went back to find him. When he got closer to the place where the two men were beating Byron, he heard yelling and cries for help. He heard someone say, "I was going to beat your ass. I'm going to kill this little nigger." Defendant testified he also heard someone say "he was getting in the truck and taking him to the hills." Byron testified he heard his assailant say, "[P]ut him in the truck, put him in the truck, take him to the hill...."
According to defendant, when he was about 40 or 50 feet away from Byron and the two men, one of the men got into a truck and the truck moved away. He saw the other man was on top of Byron and still beating him. Defendant testified he shouted, "Somebody please call the police," and later, "Stop. Get off my cousin." Byron also testified he heard someone yell, "Call the police," and, later, "Get off my cousin." According to defendant, Robinson glanced in his (defendant's) direction, but continued to beat Byron.
Four peopleByron, defendant, Lawrence and Wellingtongave statements to the police and testified about the shooting that occurred next. Byron testified at the preliminary hearing that, after he heard defendant yell out, he saw defendant come out of a yard to the side of the nearby school. He was about 32 feet away from Byron. Byron stated, "He [Robinson] [was] still hitting me. And my cousin opened fire...." Byron testified that, after the shots were fired, Robinson kneed him and ran off. Byron saw him trip, get back up and continue to run.
Defendant testified Robinson would not get off Byron, even after defendant shouted at him. Defendant explained that, when he shot the gun at Robinson, "The only thing that was going through my mind was to get him off my cousin and stop him from beating him up." In a statement made to the police after he was arrested, defendant said the second man was driving off in the truck when defendant approached Byron and the first man. Defendant said he shot one time in the air and, "When I shot at him, Byron was on the ground.... He [was] running, the dude [was] running, I shot, and then, I don't know if he fell or not, because it didn't look like he fell. He just like tripped over his feet, then he bounced back up and he started running fast. About time he was just about to make it to the hill, when I looked back, he was still running." He explained to the police, "[I] wasn't really all thinking about hitting nobody. I just wanted to get him off of my little cousin. [¶] ... [¶] I was just mainly thinking about getting him off my little cousin. As if shooting him was not a main objective."
After speaking to the police, defendant was interviewed by the district attorney. In that interview, defendant described the shooting this way: "[I] said, `Get off my cousin.' That's when I brandished the pistol and shot one time in the air. And then he just stood there and looked at me like he didn't care so I shot again." In this interview, defendant also stated, "He ran. [¶] ... [¶] I fired the gun one last time, he *674 ducked, then he got back up and then when I tried to fire again it was just, the gun wouldn't click. It was out of bullets."
Sharalyn Lawrence and Jennifer Wellington, the two women who saw the beating and shooting from their upstairs window, also described the shooting a number of times: First, to a 911 dispatcher as the shooting took place, then to the police the night of the shooting, and, finally, at the preliminary hearing and trial. On the 911 tape, Lawrence can be heard telling the dispatcher that the person on the ground was "gettin' beat again." About 25 seconds after Lawrence made this statement, two gunshots are clearly audible on the tape. The police report records Lawrence as stating, "I heard a pop, pop, pop, what seemed to be gunshots. Then I saw another guy wearing a dark blue pullover sweat shirt running toward the guys fighting. Then the guy that was beating the guy on the ground started running down the street toward the freeway." When asked about this statement at trial, Lawrence stated, "My memory has me looking at the truck, hearing the gunshot, coming back seeing the running and the shooting."
In a statement recorded in the police report taken that night, Wellington told the officer she heard the shots while the beating was in progress. However, at the trial, she testified that after the truck drove away, she saw the man who was administering the beating look up. She then saw this man run away. As he ran away, she saw a man in dark clothing coming to the aid of the man on the ground. She next saw the man in dark clothing standing with his arm extended and she saw flashes from a gun barrel and heard sounds.
Robinson was hit by a bullet from a .25 caliber pistol. He ran about 500 feet from the place where Byron had been beaten and fell next to a curb, where he was found by a police officer responding to a 911 call. The bullet entered Robinson's right lower chest or upper abdomen. He was not wounded in the back. Robinson died of internal bleeding.
After the shooting, defendant and Byron made their way to a gas station to clean up and then went home. Defendant was arrested about approximately 10 days later.
At trial, defendant requested the court instruct the jury on imperfect defense of another. The trial court denied this request. After deliberating five days, the jury convicted defendant of second degree murder and auto burglary. The jury also sustained firearm use allegations on both counts. Defendant was sentenced to a term of 40 years to life. This timely appeal followed.

III. DISCUSSION

A. Imperfect Defense of Another Instruction

At trial, defendant unsuccessfully requested an instruction on imperfect defense of another. Relying on People v. Michaels (2002) 28 Cal.4th 486, 122 Cal. Rptr.2d 285, 49 P.3d 1032 (Michaels), defendant now argues the trial court erred in rejecting the request. We conclude the doctrine of unreasonable self-defense includes the unreasonable defense of another and the requested instruction should have been given.
Under the doctrine of imperfect self-defense, a defendant's honest but unreasonable belief in the need to kill in order to defend himself can negate malice aforethought and reduce murder to manslaughter. (People v. Flannel (1979) 25 Cal.3d 668, 674-680, 160 Cal.Rptr. 84, 603 P.2d 1 (Flannel).) The question here is whether this doctrine applies when a defendant honestly but unreasonably uses *675 force in order to defend another.[2] When this case went to trial, no California court had explicitly held the Flannel doctrine of imperfect self-defense applies equally in a situation in which the defendant acts under the honest but unreasonable belief in the need to defend another. As defendant points out, the application of Flannel to imperfect defense of another is implicit in People v. Uriarte (1990) 223 Cal.App.3d 192, 198, 272 Cal.Rptr. 693, a case in which the court assumed the Flannel doctrine would apply to the defense of another, although it concluded the evidence did not warrant an instruction on this ground. (Id. at pp. 197-198, 272 Cal.Rptr. 693.)
The viability of this doctrine was addressed explicitly in Michaels, supra, 28 Cal.4th 486, 122 Cal.Rptr.2d 285, 49 P.3d 1032. In Michaels, the trial court failed to instruct the jury, sua sponte, on the unreasonable defense of another. The Michaels court concluded the trial court had no sua sponte duty to do so because "[t]he doctrine of unreasonable or imperfect defense of others, in contrast to the doctrine of unreasonable or imperfect self-defense, is not well established in California law." (Id. at p. 529, 122 Cal.Rptr.2d 285, 49 P.3d 1032.) Importantly, the court went on to say that, despite its relative obscurity, "this concept [imperfect defense of another] follows logically from the interplay between statutory and decisional law." (Id, at p. 530, 122 Cal.Rptr.2d 285, 49 P.3d 1032.) The court explained the basis for its conclusion: "Section 197 provides that `[h]omicide is .. . justifiable when committed by any person ... [¶] ... [w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.' Innovative counsel could view that statute in light of Flannel's analysis of imperfect self-defense (see People v. Flannel, supra, 25 Cal.3d at pp. 674-680, 160 Cal.Rptr. 84, 603 P.2d 1), and propose an instruction on imperfect defense of others." (Michaels, at p. 530, 122 Cal.Rptr.2d 285, 49 P.3d 1032.) Here, of course, counsel explicitly proposed this instruction. Given the Michaels court's recognition that the concept of imperfect defense of another "follows logically from the interplay between statutory and decisional law" (ibid.), the trial court erred in refusing to instruct on this point.
The Attorney General argues we need not heed the strong suggestion in Michaels approving the doctrine of imperfect defense of another because the issue in Michaels was whether the court had a sua sponte duty to give an instruction on this point. We disagree. The Michaels court leaves little doubt that, although the doctrine was not yet so well known as to mandate sua sponte instruction, counsel may legitimately request such an instruction. Having been provided with no compelling reason to disregard the clear direction of the Supreme Court on this issue, we conclude the trial court erred in rejecting defendant's request for this instruction.

B. Prejudice

As a general rule, we will not reverse a judgment for instructional error unless we determine, after a review of the entire record, it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error. (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) If the *676 error is federal constitutional error, a more stringent standard for determining prejudice applies and, under Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, we must reverse unless we are satisfied the error was harmless beyond a reasonable doubt. (See Rose v. Clark (1986) 478 U.S. 570, 579-581, 106 S.Ct. 3101, 92 L.Ed.2d 460.)
Defendant maintains we must apply the Chapman standard, while the Attorney General contends the Watson standard applies. We need not resolve this question because the failure to instruct the jury on imperfect defense of another was error even when viewed under the more lenient Watson standard.
Our review of the record indicates it is reasonably probable a result more favorable to defendant would have been reached had the trial court instructed the jury on imperfect defense of another. There was strong evidence supporting the theory that defendant fired on Robinson because he honestly, but unreasonably, believed it was necessary to save his cousin from imminent peril. Defendant was unwavering in his assertion that he fired the gun in order to defend his cousin. In his interviews with the police and the district attorney and in his testimony at trial, defendant consistently stated he fired the gun in order to get the men to stop beating his cousin. For example, at trial, defendant explained that, when he shot the gun, "The only thing that was going through my mind was to get him off my cousin and stop him from beating him up." In an interview with the police, defendant stated, "[I] wasn't really all thinking about hitting nobody. I just wanted to get him off of my little cousin. [¶] ... [¶] I was just mainly thinking about getting him off my little cousin. As if shooting him was not a main objective."
There was certainly ample evidence that defendant's cousin was undergoing a brutal beating, thus buttressing defendant's claim that he shot in order to protect his cousin. Every witness who observed the beating testified to its severity, including Lambert, one of the two people who administered it. Byron stated that the two men stomped on his head and chest and he thought he was going to die. In fact, the beating was so severe that Lawrence, observing it from her window, told the 911 operator, "[Y]ou better send an ambulance," because the man on the ground was "gettin' his ass kicked." Defendant described to the jury how he heard his cousin calling for help and then heard someone say he was going to take Byron into the hills and kill him. Bryon also testified that one of the men said, "[P]ut him in the truck, put him in the truck, take him to the hill...." Given the ample evidence that defendant acted under the honest, but unreasonable, belief in the need to defend his cousin from imminent danger, it is reasonably probable the jury would have reached a result more favorable to defendant.
The Attorney General, however, points to other evidence which suggests defendant fired on Robinson while he was running away, thus calling into question whether defendant honestly believed his cousin was in "imminent" danger. This evidence consists of the testimony of Jennifer Wellington, one of the women who watched the beating from an upstairs window. After the shooting, Wellington told the police the shooting occurred while Robinson was beating Byron. Yet, at trial, she testified the shooting occurred while Robinson was running away. Although this witness gave different stories about when the shooting occurred, other testimony and evidence is consistent with the theory that the shooting took place while Robinson was beating Byron. First, Robinson was shot in the abdomen, rather *677 than the back, physical evidence consistent with defendant's account of when he shot Robinson. The 911 tape indicates the shooting occurred quite soonless than 30 secondsafter Lawrence told the operator the beating had resumed. The short amount of time between the resumed beating and the shooting casts doubt on Wellington's account that Robinson was running away rather than beating Byron when the shooting took place. The contrary evidence cited by the Attorney General does not persuade us this instructional error was anything other than prejudicial.
The Attorney General, citing People v. Seaton (2001) 26 Cal.4th 598, 665, 110 Cal. Rptr.2d 441, 28 P.3d 175 (Seaton) and People v. Price (1991) 1 Cal.4th 324, 464, 3 Cal.Rptr.2d 106, 821 P.2d 610 (Price), argues there was sufficient evidence to support a finding of second degree felony murder and any error in refusing the unreasonable defense of another instruction was necessarily harmless. We reject this argument.
The Seaton and Price juries made specific special circumstance findings that the victim was killed in the course of a felony. In Seaton, supra, 26 Cal.4th at p. 665, 110 Cal.Rptr.2d 441, 28 P.3d 175, the jury "found true the special circumstance allegations that defendant killed the victim in the course of a burglary and a robbery" and, in Price, supra, 1 Cal.4th 324, 464, 3 Cal.Rptr.2d 106, 821 P.2d 610, the jury made a special circumstance finding that the defendant killed the victim in the perpetration of a burglary. These special circumstance findings convinced the Seaton and Price courts that any error in failing to give a lesser included offense instruction was harmless because the jury had already concluded the defendant committed the predicate felony to felony murder.
Here, in contrast to the juries in Seaton and Price, the jury in this case made no special circumstance finding. Instead, the jury was instructed it could find second degree murder on three theories: express malice, implied malice and felony murder based on a violation of section 246.3. The jury was not asked to specify which of these three routes it took when it convicted defendant of second degree murder; it simply found the defendant guilty of second degree murder. Therefore, we cannot conclude this jury found the defendant guilty of second degree felony murder and necessarily would have rejected the unreasonable defense of another as the Attorney General argues.
The Attorney General also argues that the heat of passion instructions conveyed to the jury the same principles as the refused imperfect defense of another instruction. As a result, according to the Attorney General, if the jury was convinced the defendant acted in the unreasonable defense of another, the jury could have found defendant guilty of voluntary manslaughter under the heat of passion theory.
This issue was addressed in People v. Viramontes (2001) 93 Cal.App.4th 1256, 1263, 115 Cal.Rptr.2d 229. In Viramontes, the court considered whether the failure to instruct on imperfect self-defense, despite substantial evidence supporting this instruction, was harmless. The Viramontes court concluded that, although the jury could have found the defendant guilty of manslaughter on a heat of passion theory, the court was nevertheless required to instruct on imperfect self-defense. Heat of passion and imperfect defense of another involve different elements. The heat of passion rule requires a showing that an "ordinarily reasonable person" would have been driven to act under the influence of heat of passion (CALJIC No. 8.42), while *678 imperfect self-defense turns on a defendant's subjective mental state (CALJIC No. 5.17). Therefore, as the Viramontes court concluded, the "jury's rejection of a heat of passion theory ... is irrelevant to the potential success of an imperfect self-defense theory." (93 Cal.App.4th at p. 1264, 115 Cal.Rptr.2d 229.)

C. Felony-Murder Instruction

Defendant contends that, under the merger doctrine articulated in People v. Ireland, supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (Ireland), the trial court erred in instructing the jury it could find the defendant guilty of felony murder based on the underlying felony of discharging a firearm in a grossly negligent manner, pursuant to section 246.3.[3] In order to provide the trial court with guidance on remand, we address, and reject this argument.
In Ireland, our Supreme Court reversed a conviction for second degree felony murder where the predicate felony was section 245, assault with a deadly weapon. (Ireland, supra, 70 Cal.2d at p. 538, 75 Cal. Rptr. 188, 450 P.2d 580.) Under what is referred to as the "merger" doctrine, the court held that, because assault with a deadly weapon is "an integral part of and "included in fact" within the homicide, it could not form the basis of a second degree felony-murder conviction. (Id. at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.) The court explained, "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assaulta category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged." (Ibid.)
The Ireland test was refined three decades later in People v. Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (Hansen). The Hansen court rejected the "premise that Ireland's `integral part of the homicide' language constitutes the crucial test in determining the existence of merger." (Id. at p. 314, 36 Cal. Rptr.2d 609, 885 P.2d 1022.) The court explained, "Such a test would be inconsistent with the underlying rule that only felonies `inherently dangerous to human life' are sufficiently indicative of a defendant's culpable mens rea to warrant application of the felony-murder rule. [Citation.] The more dangerous the felony, the more likely it is that a death may result directly from the commission of the felony, but resort to the `integral part of the homicide' language would preclude application of the felony-murder rule for those felonies that are most likely to result in death and that are, consequently, the felonies as to which the felony-murder doctrine is most likely to act as a deterrent...." (Ibid.) The Hansen court held, instead, that the use of an inherently dangerous felony as the predicate felony for felony-murder does not violate the merger doctrine when this use "will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (Id. at p. 315, 36 Cal. Rptr.2d 609, 885 P.2d 1022.)
*679 Applying these principles, the Hansen court approved the use of section 246 (shooting into an inhabited dwelling) as the predicate felony for second degree felony murder. We recite the court's reasoning at length because it is equally applicable to this case, which involves a similar type of felony.
The Hansen court found, "In the present case ... application of the second degree felony-murder rule would not result in the subversion of legislative intent. Most homicides do not result from violations of section 246, and thus, unlike the situation in People v. Ireland [citation], application of the felony-murder doctrine in the present context will not have the effect of `precluding] the jury from considering the issue of malice aforethought ... [in] the great majority of all homicides.' [Citation.] Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought.... [T]his is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged `maliciously and willfully') in order to support a second degree murder conviction. Indeed ... application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrine namely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Under the principles set out in Hansen, we conclude the use of section 246.3 as the predicate felony for felony murder does not offend the merger doctrine. As a preliminary matter, we note the parties do not dispute that section 246.3 is an "inherently dangerous felony" (Hansen, supra, 9 Cal.4th at p. 308, 36 Cal.Rptr.2d 609, 885 P.2d 1022) for the purposes of the second degree felony-murder rule. Indeed, in People v. Clem (2000) 78 Cal.App.4th 346, 92 Cal.Rptr.2d 727, the court found that the willful discharge of a firearm in a grossly negligent manner poses a sufficient danger to human life to support a conviction for second degree felony murder. (Id. at p. 351, 92 Cal.Rptr.2d 727.)
The first issue in applying the principles set out in Hansen is whether most homicides result from violations of section 246.3. In Hansen, the Supreme Court found that, in general, section 246 violations (malicious and willful discharge of a firearm into an inhabited dwelling) do not have this result. Section 246 criminalizes the use of firearms in certain situations, such as shooting into an inhabited dwelling, in which the discharge of a firearm is inherently dangerous. (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022; see also People v. Tabios (1998) 67 Cal.App.4th 1, 78 Cal.Rptr.2d 753 [shooting at an occupied vehicle does not violate merger doctrine].) At the same time, the Hansen court made clear that violations of section 246, while posing significant dangers, do not generally result in homicide. Section 246.3 operates in a similar way. This statute criminalizes the grossly negligent discharge of a firearm in a manner that "could result in injury or death to a person." By its use of the word "could," the Legislature has indicated that this felony is not one that generally results in homicide, but instead, involves criminally dangerous behavior that represents a threat to human life. In fact, as the court in People v. Alonzo (1993) 13 Cal.App.4th 535, 539, 16 Cal.Rptr.2d 656 pointed out, the Legislature enacted section 246.3 to *680 deter the dangerous practice of discharging firearms in public during festive occasions, a practice that could, but generally does not, result in homicide.[4] We conclude that, as with section 246, the use of section 246.3 as the underlying felony in a felony-murder charge would not "`preclud[e] the jury from considering the issue of malice aforethought ... [in] the great majority of all homicides.'" (Hansen, at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022, quoting Ireland, supra, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.) In reaching this conclusion, it is not our objective to subvert the Legislature's intent that, in the great majority of homicides, the jury will consider the issue of whether defendant possessed malice aforethought. Rather, as the Hansen court found with regard to section 246, the use of section 246.3 as the underlying felony in a felony-murder prosecution accomplishes one of the goals of the felony-murder ruleto deter "negligent or accidental killings that occur in the course of the commission of dangerous felonies." (Hansen, at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
As for the second consideration in the Hansen analysis, we conclude that use of section 246.3 as the predicate felony for felony murder would not upset the "Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought." (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Here, as in Hansen, "this is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged `maliciously and willfully') in order to support a second degree murder conviction." (Ibid.)
Defendant, however, contends that negligent discharge of a firearm under section 246.3 is a lesser form of assault with a firearm, the predicate felony barred in Ireland, and therefore should be similarly barred from use under the merger doctrine. Defendant's argument, which applies equally to section 246, was raised by Justice Mosk in his concurring and dissenting opinion in Hansen. (Hansen, supra, 9 Cal.4th at p. 326, 36 Cal.Rptr.2d 609, 885 P.2d 1022, cone. & dis. opn. of Mosk, J.) The Hansen majority, in approving the use of section 246 as a predicate felony for felony murder, rejected this contention. We do so here as well.
Defendant also argues that the use of section 246.3 as a predicate felony to felony murder will result in the decimation of the Ireland rule. He speculates that the People, faced with a crime involving an assault with a deadly weapon (section 245), will attempt to secure a felony-murder conviction by charging the crime as a violation of section 246.3. In this way, according to defendant, the People will attempt to evade the prohibition set out in Ireland against the use of section 245 as the predicate felony to felony murder.
We are not persuaded. The trial court is required to instruct only on those "`"... general principles of law relevant to the issues raised by the evidence. [Citations.] *681 The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."'" (People v. Breverman (1998) 19 Cal.4th 142, 154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) Defendant's argument assumes that a trial court, faced with a crime that falls squarely within the definition of section 245, will nevertheless ignore its duties and instruct the jury on principles relevant to section 246.3. We do not share this assumption. Actions that would amount to a violation of section 245 are distinct from those that would result in a violation of section 246.3. The facts in Ireland provide a useful example. In Ireland, the defendant fired three shots at close range directly at his wife. One bullet struck a window and the second and third struck her in the eye and chest, killing her. (Ireland, supra, 70 Cal.2d at p. 528, 75 Cal.Rptr. 188, 450 P.2d 580.) This incident constituted an assault with a deadly weapon because the discharge of the gun directly at the victim was an act that "by its nature will likely result in physical force on another...." (People v. Colantuono (1994) 7 Cal.4th 206, 217, 26 Cal.Rptr.2d 908, 865 P.2d 704.) The Ireland defendant's actions would not, however, fall within section 246.3's proscription of a grossly negligent discharge of a firearm in a manner that could result in injury or death. In Ireland, the firing of shots at the victim from a close range was not a crime that could result in injury or death: It was a crime likely to result in injury or death. Thus, there would have been no factual basis for charging the Ireland defendant with a violation of section 246.3. It is our expectation that trial courts will recognize this distinction and instruct accordingly.
Defendant also assumes the People will deliberately and improperly characterize a section 245 assault as a violation of section 246.3 in order to secure a felony-murder conviction. This concern is speculative and unconvincing. We will not assume that the People will engage in this sort of manipulation. (See, e.g., People v. Hendricks (1987) 43 Cal.3d 584, 596, fn. 2, 238 Cal.Rptr. 66, 737 P.2d 1350.) It bears repeating here that it is as much the People's "duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (Berger v. United States (1935) 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314.)
We conclude, therefore, that the use of section 246.3 as the predicate felony for felony murder does not violate the merger doctrine. Instead, its use in those limited situations in which the grossly negligent discharge of a firearm results in death accomplishes the "traditionally recognized purpose of the second degree felony-murder doctrinenamely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Finally, defendant raises several arguments of error regarding this instruction beyond those having to do with the merger doctrine. First, he contends that, because the homicide in this case predates People v. Clem, supra, 78 Cal.App.4th 346, 92 Cal.Rptr.2d 727 (Clem) [section 246.3 an "inherently dangerous felony" under the felony-murder rule], approval of the instruction here would amount to an impermissible judicial enlargement of the felony-murder doctrine and the retroactive application of Clem would offend due process. We disagree.
In general, a judicial construction of a criminal statute cannot be given retroactive *682 effect where the decision is "`... "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue"....'" (People v. King (1993) 5 Cal.4th 59, 79-80, 19 Cal. Rptr.2d 233, 851 P.2d 27.) As our discussion of the merger doctrine makes clear, our approval of the use of section 246.3 as the predicate felony for felony murder is the predictable outcome of the principles articulated in People v. Hansen. Moreover, the Clem court's conclusion that section 246.3 involves an inherently dangerous felony also follows directly from the Hansen court's conclusion that discharging a firearm in a place where people are likely to be present, such as an inhabited dwelling, is inherently dangerous. In reaching its conclusion that section 246.3 is a similarly inherently dangerous felony, the Clem court noted that the offense "falls squarely within the established boundaries of the [felony-murder] rule." (Clem, supra, 78 Cal.App.4th at p. 354, 92 Cal. Rptr.2d 727.) We agree and, accordingly, reject defendant's due process argument.
Defendant also contends, relying on Yates v. Evatt (1991) 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432, that the second degree felony-murder rule offends due process because it removes the element of malice from the jury's consideration. We do not agree. This issue has long been settled with regard to first degree felony murder. In People v. Dillon (1983) 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (Dillon), our Supreme Court held that the felony-murder rule did not impermissibly raise a presumption of malice in violation of due process. The Dillon court explained that the felony-murder rule does not presume malice. Instead, "[t]he `substantive statutory definition' of the crime of first degree felony murder in this state does not include either malice or premeditation: `These elements are eliminated by the felony-murder doctrine, and the only criminal intent required is the specific intent to commit the particular felony.' [Citations.] This is `a rule of substantive law in California and not merely an evidentiary shortcut to finding malice as it withdraws from the jury the requirement that they find either express malice or ... implied malice' [citation]. In short, `malice aforethought is not an element of murder under the felony-murder doctrine.' [Citation.]" (Dillon, at p. 475, 194 Cal.Rptr. 390, 668 P.2d 697.)
The substantive rule that malice aforethought is not an element of felony murder operates no differently in a second degree felony-murder case than it does in one involving first degree felony murder. In People v. Patterson (1989) 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549 (Patterson), the court, citing Dillon, explained, "Although the second degree felony-murder doctrine operates as a substitute for implied malice, this does not mean that the doctrine results in a `conclusive presumption' of malice." (Patterson, at p. 626, fn. 8, 262 Cal.Rptr. 195, 778 P.2d 549.) Defendant's response to this is to point out that the majority opinion in Patterson was one in which three justices joined in part and dissented in part and thus suggests some disagreement on this matter. However, no fair reading of Patterson reveals any dispute about whether second degree felony murder impermissibly permits a jury to presume malice. It does not. Therefore, the rule does not offend due process.
We also reject defendant's argument that the trial court erred in instructing the jury that the heat of passion rule could not be used to reduce a finding of second degree felony murder to voluntary manslaughter. It is well established that "neither `heat of passion' nor provocation can ever reduce a murder properly based on the felony-murder doctrine to *683 voluntary manslaughter, and an instruction to that effect would be error. This is so because `malice,' the mental state which otherwise distinguishes murder from voluntary manslaughter, is not an element of felony murder. The only mental state required for felony murder is that necessary for commission of the underlying felony. [Citation.]" (People v. Balderas (1985) 41 Cal.3d 144, 197, 222 Cal.Rptr. 184, 711 P.2d 480 (Balderas).)
Defendant attempts to distinguish Balderas on the ground that Balderas concerned first degree felony murder, which is statutorily based, while this case involves second degree felony murder, a rule that has not been codified. In effect, defendant is contending we should disregard Balderas simply because the heat of passion doctrine is statutory and the second degree felony-murder rule is not. We are not convinced. The rule announced in Balderas is simply not dependent on the distinction drawn by defendant and, therefore, we reject defendant's suggestion that the trial court should have instructed the jury differently.
Finally, we do not agree due process principles prohibit the retroactive application of our conclusion that the heat of passion doctrine is not applicable to second degree felony murder. Our conclusion is anticipated by the Supreme Court's decisions in Dillon and Balderas and is not "`... "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue"....'" (People v. King, supra, 5 Cal.4th 59, 79-80, 19 Cal.Rptr.2d 233, 851 P.2d 27.) Therefore, its application here does not offend due process.

IV. DISPOSITION
The judgment convicting defendant of second degree murder is reversed. The cause is remanded for a new trial on that count. In all other respects, the judgment is affirmed.
We concur: MARCHIANO, P.J., and SWAGER, J.
NOTES
[1] All further statutory references are to the Penal Code, unless otherwise noted.
[2] The parties acknowledge, as they must, that one who reasonably believes force is necessary in order to defend another is entitled to an instruction on this point. (People v. Will (1926) 79 Cal.App. 101, 114, 248 P. 1078; People v. Williams (1977) 75 Cal.App.3d 731, 743, 142 Cal.Rptr. 704.)
[3] Section 246.3 provides: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison."
[4] The legislative history of section 246.3 supports our conclusion that most homicides are not the result of violations of the statute. According to the sponsor of the bill, in the County of Los Angeles in 1987, the year before section 246.3 was enacted, "two people were killed and at least three were injured by spent bullets during [the] year's New Year celebration...." These two deaths were a small fraction of the number of offenses. All told, during the New Year celebrations, 14 people were arrested on gun-related charges, 52 guns were seized, and law enforcement officials responded to more than 400 calls in which bullets penetrated cars, windows, and homes. (Assem.3d reading digest of Assem. Bill No. 3066 (1987-1988 Reg. Sess.) as amended March 24, 1988, p. 2.)