1 Cal.Rptr.3d 353 (2003)
109 Cal.App.4th 1740
The PEOPLE, Plaintiff and Respondent,
v.
Quincy ROBERTSON, Defendant and Appellant.
No. A095055.
Court of Appeal, First District, Division Four.
June 30, 2003.
Review Granted October 1, 2003.
*354 Juliana Drous, San Francisco, for Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, William Kuimelis, Deputy Attorney General, for Respondent.
Certified for Partial Publication.[*]
KAY, P.J.
Appellant Quincy Robertson was convicted by a jury of the second degree murder of Kehinde Riley (Pen.Code, § 187), and assault of Rickey Harris with infliction of great bodily injury (Pen.Code, §§ 245, subd. (a)(1), 12022.7, subd. (a)), and was found to have personally used a firearm in the commission of these offenses (Pen.Code, §§ 1203.06, 12022.5, 12022.53, subd. (d)). He was sentenced to 40 years to life in prison, representing 15 years to life for the murder, plus 25 years to life for the firearm enhancement of the murder conviction, with a concurrent sentence of 8 years for the assault and related enhancements. The principal issue on appeal *355 is whether the court erred in instructing the jury that it could convict appellant of second degree murder on a felony murder theory based on his commission of the offense of grossly negligent discharge of a firearm (Pen.Code, § 246.3).
In order for a felony to serve as a predicate offense for a charge of felony murder, the felony must be inherently dangerous to human life, and it must not "merge" with the resulting homicide under the merger doctrine applied in People v. Ireland (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 and subsequent cases. (See People v. Hansen (1994) 9 Cal.4th 300, 308-316, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) In People v. Clem (2000) 78 Cal. App.4th 346, 348, 92 Cal.Rptr.2d 727, we held that grossly negligent discharge of a firearm is an inherently dangerous felony for purposes of the felony-murder rule. Here, we must determine whether the merger doctrine prevents this crime from serving as a predicate offense for felony murder, notwithstanding its inherent danger.
In the published portion of this opinion we hold, under the standards for merger set forth in People v. Hansen, supra, that grossly negligent discharge of a firearm is an offense that merges with a resulting homicide, and thus cannot serve as a predicate for felony murder. However, while it was error to instruct the jury that it could convict appellant of second degree felony murder based on commission of this offense, we conclude that the error was harmless in this case. In the unpublished portion of the discussion, we conclude that appellant was not prejudiced by the court's failure to instruct on involuntary manslaughter, and that the court did not err in allowing appellant's custodial statements into evidence. We therefore affirm the judgment.

I. BACKGROUND
The incident occurred around 10:30 p.m. on December 27, 1998, in 99th Avenue Court, off 99th Avenue, in Oakland. The victims, Kehinde Riley and Rickey Harris aka Rickey Baker, were riding around with Bradley Gentry in a car driven by Lamont Benton, drinking wine, smoking marijuana, and snorting cocaine. They pulled into 99th Avenue Court following two women in another car; Benton hoped to get the driver's phone number. After Benton spoke to the driver and the women drove away, Benton got back in his car, and Riley and Harris went over to appellant's Chevrolet Caprice Classic, which was parked in front of his apartment in the court, and began stealing its hubcaps. Gentry testified that he stood next to Benton's car and watched Riley and Harris take the hubcaps off the tires on the passenger side of the Chevy, load them in the backseat of Benton's car, and return to the driver's side of the Chevy.
Gentry recalled that it was very quiet in the court, and that the hubcaps made a loud noise when they were pried off. In tape recorded statements given after his arrest, appellant said that he was home watching television with his wife and two children when he heard a loud noise outside his window. He said the noise was close by the window, and sounded like someone was trying to break into the house. The night was cold and foggy although not a "low," "down to the ground" fog, according to one of the police officers who later arrived at the scene. Appellant said that when he heard the noise outside his window, he went outside onto his porch without putting on a shirt or jacket, carrying a nine millimeter semiautomatic handgun. He said that he got the gun because he did not know what was happening, he was frightened, and he wanted to protect his family.
*356 Appellant said that when he stepped outside he saw three or four guys next to his Chevy; they looked like they were dismantling the car or trying to take it. He said that the men "looked at me sorta funny," like they were going to "come back and try to do something] to me"; he did not see their faces because "my heart was beatin' too fast. I didn't know what they was gonna do." He remembered firing the gun twice at that point; he said the shots were "warning" shots, and that he fired them "in the air," holding the gun up at a 45-degree angle. Physical evidence indicated that appellant initially fired three shots. One nine millimeter shell casing was recovered from his porch, and two more from the dirt in front of the porch. One bullet hole and bullet were found in the Chevy; two bullet holes and one bullet were found in a camper belonging to Paul Brown, a neighbor who lived across the street. Although appellant said that he fired up into the air, the bullet holes in Brown's camper were only two to three feet off the ground.
After the first shots were fired, Riley and Harris ran away, and Benton and Gentry drove away, from the interior of the court out toward 99th Avenue. Appellant saw the guys by his car run away, saw a car speed away, and heard "somethin' like a backfire or a gunshot." Appellant admitted walking down off his stairs onto the sidewalk or street in front of his apartment, and firing his gun again. He recalled firing three shots in the direction of the fleeing men. He said he could see them running all the way down the court to 99th Avenue, and thought he saw them turn the corner at the end of the court. He said that he tried to shoot up "in the air," and that he did not intend to hit anyone.
Riley's dead body was found 15 to 20 feet into 99th Avenue, outside 99th Avenue Court. He died from a gunshot wound to the back of the head; he was 20 or 21 years old. An autopsy showed that he had cocaine and heroin in his system when he was killed. Harris was shot in the sole of his right foot, and had surgery later that night to remove the bullet. He was 20 years old at the time of the incident at 99th Avenue Court; he was shot and killed in an unrelated incident the next year.
Paul Brown, the neighbor across the street, looked outside after he heard the first round of shots, and saw a person standing in the street, close to the cars on the other side of the court, in a "firing stance," with legs spread and arm extended parallel to the ground, shooting out toward 99th Ave. Brown never saw the shooter raise his gun in the air. Appellant said that he did not count the rounds, and conceded that he might have fired more than five shots after he left his porch. Appellant at one point admitted going into the middle of the court before firing the second set of shots, then said he did not remember going there, and then said he had "probably" done so.
Seven nine-millimeter casings were found in the middle of 99th Avenue Court. Bullets were recovered from Riley and Harris; a bullet fragment was found on the sidewalk at the corner of 99th Avenue and 99th Avenue Court; bullet strike marks were found on a wash house on 99th Avenue across from 99th Avenue Court. The gun used in the shootings was never recovered. A police firearms examiner concluded from the bullets and casings that all of the shots had come from a single nine-millimeter luger firearm, probably manufactured by Lorcin, a gun that holds ten bullets. Sergeant Tolleson, a police firearms expert, testified that the shooter would not have hit the fleeing men if he were holding the gun at a 45-degree angle; he would have had to point his gun *357 at the men in order to hit them. Riley was about 50 yards away from appellant when he was shot; Tolleson opined that it would have been relatively easy to hit someone at that distance with as many shots as were fired.
After the shots stopped, Brown saw the shooter walk into an apartment in the fourplex where appellant lived. Brown called 911 and police arrived at the scene very quickly. In his taped statements, appellant said that he returned to his apartment, dropped his gun in the living room, put on a coat, and went back outside. As appellant walked down the steps in front of the apartment he was apprehended by Officer Sena, handcuffed, and put in the back of a patrol car. Benton and Gentry were detained near the scene by an officer who heard gunshots and saw Benton's car pull out of 99th Avenue Court with its lights off. The police caught up with Harris around midnight at a nearby hospital.
In his initial statement at the scene, appellant said that he heard someone "messing with his car," went outside, heard gunshots, "didn't see anything," and went back inside. When appellant was asked to consent to a test for gunshot residue on his hands, he admitted that he had shot a gun earlier that night. He said that he had sold the gun, and had fired a couple of rounds to show the buyer that the gun was working. The residue test was positive, indicating that appellant had recently fired a gun. Appellant consented to a search of his apartment, where the police found bullets that matched the casings found on the scene, along with eight boxes of .22-caliber rifle cartridges, and a bulletproof vest. Appellant was taken to the police station around 3:00 a.m. He gave his taped statements in interviews the following afternoon with Sergeants Brock and Joyner, and the following evening with personnel from the district attorney's office.
Benton and Gentry testified that no one in the car had weapons on the night of their encounter with appellant. Benton acknowledged having been arrested on another occasion for drug and gun possession, and Gentry admitted having been convicted of burglary. They said they had agreed, when pulled over after the shootings, to tell the police a "b.s. story" about hearing shots and leaving the scene, but then told the truth after learning that Riley had been killed. Riley was holding a screwdriver in his hand when he was shot. A gunshot residue test on Riley and Harris were negative; no residue tests were performed on Benton or Gentry.
Appellant said he was afraid of the men he saw by his car, and heard a backfire or shot when the men were running away, but did not see anyone with weapons. He admitted that the men were running away from him when he fired the second set of shots; he said that he fired those shots to "scare people away from my domain."[1] *358 He conceded that firing a gun in a residential area could kill people, but said, "I wasn't thinking at that time." He denied having been angry enough to harm someone, and said, "I feel real bad, I mean real bad" about what happened. He did not tell the truth in his original statement at the scene because he saw the body laying on the ground when he was taken to the police car, and worried that the man had been hit by one of his bullets, or the other backfire or shot he had heard. "I was hopin' I didn't do ... that," he said.
Appellant did not testify at trial. The defense called a series of character witnessesappellant's mother, people who had supervised him at work, a neighbor, a friendwho testified that he was not a violent person or prone to anger. Appellant was 25 years old at the time of the incident and had no prior criminal record. He worked intermittently for the U.S. Postal Service, and was unemployed in December 1998. His wife testified that he worked on automobiles as a hobby and "like[d] his cars"; before the hubcaps were stolen, he had just put a new windshield in the Chevy and was restoring it for resale. She said that at least three of their cars had been broken into or vandalized on 99th Avenue Court.
Six months before the night in question appellant had been shot in an altercation arising out of a traffic accident. Appellant's nephew, Aaron Timms, testified that he was driving with appellant as a passenger in March 1998 when they were sideswiped by another vehicle. The cars pulled over, and Timms and the other driver got out and had an argument about who was at fault. Appellant got out of the car when the other driver took out a gun, and the other driver shot him in the right shoulder. Appellant and Timms went to the hospital and filed a police report.
Appellant mentioned having been shot in his statements to the police in this case. He said that he had "no function" in his right hand because he had been shot in the arm following a traffic accident, and thus had fired his gun with his left hand, even though he was right-handed. Appellant cited the traffic incident as a reason for not calling the police when his hubcaps were being stolen; he said that he distrusted the police because his nephew had been wrongly imprisoned, and because he felt he had not been treated fairly when he reported being shot. He said that he did not know "if [he] was gonna live or die" when he was shot.
Clinical psychologist Robert Kaufman testified for the defense that appellant was suffering from post-traumatic stress disorder (PTSD) in December 1998 as a result of having been shot earlier in the year. Kaufman's opinion was based on: psychological testing of appellant; multiple interviews of appellant, and interviews of his wife and mother; appellant's work and jail records; appellant's taped statements to the police in December 1998; and police reports of the December and March 1998 incidents, and a 1997 incident when appellant was the victim of a carjacking.
Appellant exhibited symptoms of PTSD when he became reclusive and fearful after he was shot. Appellant was edgy and easily startled during this periodsigns of PTSD-based "hyperarousal" that could cause a person to overreact, or react out of character, to threatening situations. Personality testing showed that appellant tended toward depression rather than aggression, and had strong protective instincts. Kaufman attributed those instincts to pressure on appellant to be the "man of the house" when he was growing *359 up as the only male in a household with a mother (herself a victim of violent crime) and three older sisters. Given those instincts, Kaufman thought that appellant would have been "terrified" after he was shot when he was unable to work and take care of his family.
Herman Rellar, a police academy firearms instructor, testified for the defense that people who are inexperienced with handguns tend to shoot lower than they aim because they grip the gun and pull the trigger improperly. He said that it is difficult to shoot straight when firing rapidly, and opined that it would be hard for an inexperienced shooter to hit a moving target from a distance of 50 yards.
The prosecution argued that a second degree murder conviction was justified under any one of four theories: (1) first degree murder, reduced to second degree by provocation; (2) second degree murder with express malice; (3) second degree murder with implied malice; or (4) second degree felony murder based on commission of the crime of grossly negligent discharge of a firearm. The jury was instructed that it need not unanimously agree on any one of these theories to convict appellant of second degree murder, provided all agreed that one of the theories applied. The defense argued for a voluntary manslaughter conviction on the grounds that appellant had acted in the heat of passion, or from an honest but unreasonable belief in the need to defend himself; the court declined to instruct the jury on involuntary manslaughter.
Introduction of evidence in the case, which included a trip to 99th Avenue Court for the jury to view the scene of the crime, consumed over eight full court days. After the jury had deliberated for three full days, a juror reported that he or she could not continue deliberating and asked to be replaced. The juror said that the deliberations were "real heated," and that the stress was exacerbating his or her ulcers and Crohn's disease. The juror was excused, an alternate was sworn, and the jury was instructed to begin its deliberations anew. The jury then deliberated for another three full days before rendering its verdicts.

II. DISCUSSION

A. Felony-Murder Instruction

(1) Appellant's Argument and the Instructions Given

Appellant contends that the court erred in giving the jury a second degree felony-murder instruction based on his commission of the offense of grossly negligent discharge of a firearm (Pen.Code, § 246.3).[2] "The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of all felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought and to classify the offense as murder of the first degree in homicides which are the direct causal result of those ... felonies specifically enumerated in section 189 ..." (People v. Ireland, supra, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.) As has been noted, in People v. Clem, supra, 78 Cal.App.4th at p. 348, 92 Cal.Rptr .2d 727, we held that grossly negligent discharge of a firearm in violation of section 246.3, a felony not listed in section 189, is "inherently dangerous to human life" within the meaning of the second degree felony-murder rule.
Section 246.3, enacted in 1988 (Stats. 1988, ch. 1275, § 1, p. 4265), provides in *360 full that: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison." The jury was instructed on the elements of the offense pursuant to CALJIC No. 9.03.3 (6th ed.1996) as follows: "Every person who willfully and unlawfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a violation of Penal Code section 246.3, a crime. In order to prove this crime each of the following elements must be proved: 1. a person willfully and unlawfully discharged a firearm; 2. the person who discharged the firearm did so in a grossly negligent manner; and 3. the discharge of the firearm was done in a manner which could result in injury or death to a person."
The "gross negligence" element of section 246.3 was defined for the jury in terms of CALJIC No. 3.36 (6th ed. 1996): "`Gross negligence' means conduct which is more than ordinary negligence. Ordinary negligence is the failure to exercise ordinary or reasonable care. `Gross negligence' refers to a negligent act which is aggravated, reckless or flagrant and which is such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or a danger to human life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent act could reasonably have been foreseen and it must appear that the death or danger to human life was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act."
"[T]he giving of a second degree felony-murder instruction in a murder prosecution has the effect of `relieving] the jury of the necessity of finding one of the elements of the crime of murder' [citation], to wit, malice aforethought." (People v. Ireland, supra, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.) The jury was given standard instructions on the prosecution's three theories of second degree murder with malicefirst degree murder with some provocation (CALJIC No. 8.20 (6th ed.1996) [deliberate and premeditated killing with express malice]; CALJIC No. 8.73 (6th ed.1996) [provocation reducing degree of murder]); second degree murder with express malice (CALJIC No. 8.30 (6th ed.1996)); and second degree murder with implied malice (CALJIC No. 8.31 (6th ed.1996))as well as the second degree felony-murder instruction that required no finding of malice: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs ... as the direct causal result of the crime of Penal Code 246.3 is murder of the second degree when the perpetrator had the specific intent to commit that crime. The specific intent to commit Penal Code 246.3 and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.32 (6th ed.1996).)
Other instructions confirmed that appellant could be convicted of murder based on a felony-murder theory in lieu of a finding of malice. The jury was instructed pursuant to CALJIC No. 8.10 (6th ed.1996) that: "Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of Penal Code 246.3, a felony inherently dangerous to human life, is guilty of the crime of murder, in violation of section 187 of the Penal Code. A killing is *361 unlawful if it was neither justifiable nor excusable. In order to prove this crime each of the following elements must be proved: 1. a human being was killed; 2. the killing was unlawful; 3. the killing was done with malice aforethought or occurred during the commission or attempted commission of Penal Code section 246.3, a felony inherently dangerous to human life." (Italics added.) The jury was further instructed that: "In order to find the defendant guilty of murder in the second degree, it is not necessary that the jury unanimously agree as to the theory [on] which the second degree murder is based.... It is only necessary that the jury unanimously agree that the killing was murder in the second degree under any of the theories. In other words, some of you may feel it was based upon the 246.3 and ... others of you may feel ... there was malice."
The jury was instructed on voluntary manslaughter as a lesser offense to that of murder, but "[t]he net effect of th[e] imputation of malice by means of the felony-murder rule is to eliminate the possibility of finding unlawful killings resulting from the commission of a felony to be manslaughter, rather than murder." (People v. Burton (1971) 6 Cal.3d 375, 385, 99 Cal.Rptr. 1, 491 P.2d 793.)
Appellant submits that the felony-murder instructions in this case were erroneous because the offense of grossly negligent discharge of a firearm "merged" with the resulting homicide under the merger, or "Ireland" (People v. Ireland, supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580) doctrine. Whether a felony merges with a homicide so as to preclude application of the felony-murder rule is an issue separate and distinct from whether the felony could otherwise serve as a predicate for a felony-murder charge because of its inherent danger to human life. In People v. Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, for example, the court first determined that malicious and willful discharge of a firearm at an inhabited dwelling in violation of section 246 was an inherently dangerous felony (id. at pp. 308-311, 36 Cal.Rptr.2d 609, 885 P.2d 1022), and then examined whether the merger doctrine nonetheless applied (id. at p. 311, 36 Cal.Rptr.2d 609, 885 P.2d 1022). Accordingly, our conclusion in People v. Clem, supra, 78 Cal.App.4th at p. 346, 92 Cal. Rptr.2d 727, that grossly negligent discharge of a firearm is an inherently dangerous offense does not bear on the merger issue presented here, and in addressing that issuewhich was neither raised nor considered in Clemwe are writing on an clean slate.

(2) The Merger Doctrine and the Hansen Decision.

The merger doctrine was first applied in California in People v. Ireland, supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580. The defendant shot and killed his wife, and the instructions permitted the jury to convict him of second degree felony murder based on assault with a deadly weapon. The court concluded that the instructions were improper, reasoning that felony murder should not be used to "effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assaulta category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact *362 within the offense charged." (Id. at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.)
People v. Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, noted that, before Ireland, "the `merger' doctrine had been developed in other jurisdictions as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or `predicate') felony committed by the defendant was assault. The name of the doctrine derived from the characterization of the assault as an offense that `merged' with the resulting homicide." (Id. at p. 311, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Courts and commentators reasoned that because "a homicide generally results from the commission of an assault," the "application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefore punishable as manslaughter)." (Id. at pp. 311-312, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) The doctrine as applied to assaults thus "preserv[es] some meaningful domain in which the Legislature's careful gradation of homicide offenses can be implemented." (Id. at p. 312, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Ireland's suggestion that the merger doctrine would extend to any felony "which is an integral part of the homicide" was called into question in People v. Taylor (1970) 11 Cal.App.3d 57, 89 Cal.Rptr. 697, where the felony was furnishing of heroin (former Health & Saf.Code, § 11501) and the recipient died of an overdose. Taylor reasoned in essence that the Ireland test could "potentially encompass[ ] all felonies closely related to a homicide (and therefore possibly every felony inherently dangerous to human life)." (People v. Hansen, supra, 9 Cal.4th at p. 314, 36 Cal. Rptr.2d 609, 885 P.2d 1022, discussing Taylor.) Taylor formulated an alternative test for merger: the offense would not merge "`if the act causing the death [is] committed with a collateral and independent felonious design'" (People v. Taylor, supra, at p. 61, 89 Cal.Rptr. 697, italics omitted), that is, "the felony was not done with the intent to commit injury which would cause death" (People v. Mattison (1971) 4 Cal.3d 177, 185, 93 Cal.Rptr. 185, 481 P.2d 193, discussing Taylor). Taylor's "independent felonious design" test was adopted by the Supreme Court in People v. Mattison, supra, where, on facts similar to those in Taylor, the death resulted from ingestion of methyl alcohol furnished by the defendant in violation of former section 347 (felony poisoning). Under this test, the felonies and homicides in Taylor and Mattison did not merge so as to preclude convictions of felony murder because the felonies were done with a design independent of injuring the victim. (See People v. Smith (1984) 35 Cal.3d 798, 808, 201 Cal.Rptr. 311, 678 P.2d 886 [identifying the independent design in Mattison as the furnishing of a dangerous substance for financial gain].)
In People v. Hansen, supra, 9 Cal.4th at pp. 314-315, 36 Cal.Rptr.2d 609, 885 P.2d 1022, a majority of our Supreme Court, after reviewing the foregoing history, declined to apply the "`integral part of the homicide'" and "independent felonious design" tests, finding them "somewhat artificial" and capable of producing "anomalous result[s]." The majority reasoned that the "`integral part of the homicide'" test was *363 "inconsistent with the underlying rule that only felonies `inherently dangerous to human life' are sufficiently indicative of a defendant's culpable mens rea to warrant application of the felony-murder rule. [Citation.] The more dangerous the felony, the more likely it is that a death may result directly from the commission of the felony, but resort to the `integral part of the homicide' language would preclude application of the felony-murder rule for those felonies that are most likely to result in death and that are, consequently, the felonies as to which the felony-murder doctrine is most likely to act as a deterrent (because the perpetrator could foresee the great likelihood that death may result, negligently or accidentally)." (Id. at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) The "independent felonious design test" was likewise flawed, because, under that test, "a felon who acts with a purpose other than specifically to inflict injury upon someonefor example, with the intent to sell narcotics for financial gain, or to discharge a firearm at a building solely to intimidate the occupantsis subject to greater criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim." (Id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Having abandoned the two principal tests that had been developed for application of the merger doctrine, the Hansen court fell back on the doctrine's core rationale, as reflected in Ireland and described in Taylor, to analyze whether the offense in question merged with the resulting homicide. Hansen "agree[d] with Taylor's definition of the scope of the Ireland rule," insofar as Taylor reasoned that: "when the Legislature has prescribed that an assault resulting in death constitutes second degree murder if the felon acts with malice, it would subvert the legislative intent for a court to apply the felony-murder rule automatically to elevate all felonious assaults resulting in death to second degree murder even where the felon does not act with malice. In other words, if the felony-murder rule were applied to felonious assaults, all such assaults ending in death would constitute murder, effectively eliminating the requirement of malicea result clearly contrary to legislative intent.... [H]owever, ... when the underlying or predicate felony is not assault, but rather is a felony such as the furnishing of heroin involved in Taylor, application of the felony-murder rule would not subvert the legislative intent, because `this is simply not a situation where the Legislature has demanded a showing of actual malice, as distinguished from malice implied in law by way of the felony-murder rule.'" (People v. Hansen, supra, 9 Cal.4th at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Thus, the test for merger boiled down to whether use of the felony to support a felony-murder conviction would "elevate all felonious assaults to murder or otherwise subvert the legislative intent." (Id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Applying this test to the felony of malicious and willful discharge of a firearm at an inhabited dwelling, the court found no merger: "In the present case, as in Mattison and Taylor, application of the second degree felony-murder rule would not result in the subversion of legislative intent. Most homicides do not result from violations of section 246, and thus, unlike the situation in People v. Ireland supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, application of the felony-murder doctrine in the present context will not have the effect of `precluding] the jury from considering the issue of malice aforethought ... [in] the great majority of all homicides.' (Id. at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.) Similarly, application of the felony-murder doctrine in the case before us *364 would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought. As in Taylor, this is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged `maliciously and willfully') in order to support a second degree murder conviction. Indeed ... application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrinenamely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." {People v. Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr .2d 609, 885 P.2d 1022.)

(3) Application of Hansen

(a) Relevant Principles

We are called upon to apply the merger doctrine, consistent with Hansen, to a different firearm offense, that of grossly negligent discharge of a firearm in violation of section 246.3. We begin by reviewing the considerations Hansen found pertinent.
Hansen could be interpreted to disapprove entirely of the "integral part of the homicide" and "independent felonious design" tests for merger. The Hansen majority did not discuss how either of the tests would have operated in that case, or reject the tests because of any anomaly the tests would have produced with respect to the offense at issue. The court simply declined to "rely upon a somewhat artificial test that may lead to an anomalous result" {People v. Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022, italics added)an approach that would seem to reject the tests categorically.
On the other hand, there is language in Hansen suggesting that the tests may still be operative. The majority opinion "reject[ed] ... the premise" that the "`integral part of the homicide'" test "constitute[s] the crucial test in determining the existence of merger." {People v. Hansen, supra, 9 Cal.4th at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022, italics added.) That a test is not "crucial" does not necessarily mean, of course, that it is entirely irrelevant. (See also id., at p. 318, 36 Cal. Rptr.2d 609, 885 P.2d 1022 (cone. opn. of Werdegar, J.) [agreeing with the majority's conclusion that the "integral part of the homicide" test was not "decisive of the merger issue in this case" (italics added)].) Similarly, the majority's rejection of the "independent felonious design" test "as the critical test determinative of merger in all cases" {id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022, italics added) suggests some remaining scope for that test as well. It appears that the traditional tests may not be entirely irrelevant, but now carry relatively little weight, and our analysis will be tailored accordingly.
Hansen pointed out that, while certain felonies other than assault, such as burglary with intent to commit assault with a deadly weapon {People v. Wilson (1969) 1 Cal.3d 431, 440, 82 Cal.Rptr. 494, 462 P.2d 22) and assaultive child abuse {People v. Smith, supra, 35 Cal.3d 798, 201 Cal.Rptr. 311, 678 P.2d 886), had been found to merge with resulting homicides, the merger doctrine had never been extended by the Supreme Court "beyond the context of assault." (People v. Hansen, supra, 9 Cal.4th at p. 312, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Notwithstanding this observation, and other language in the opinion, which might suggest that the doctrine is confined to assault offenses (see id., at p. 326, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (cone. & dis. opn. of Mosk, J.)), we do not *365 interpret Hansen to so hold. The majority ultimately indicated that the doctrine is meant to ensure that the felony-murder rule does not "elevate all felonious assaults to murder or otherwise subvert the legislative intent." (Id. at p. 315, 36 Cal.Rptr .2d 609, 885 P.2d 1022, italics added.) Thus, it is not dispositive whether the offense involves a felonious assault.
The crux of the matter under Hansen subversion of legislative intentis a function, as we see it, of the percentage of total homicides that result from the felonious conduct in question. Since the felony-murder rule eliminates the element of malice otherwise required for murder under the statutory scheme for punishment of homicides, and since, for example, the "great majority" of homicides occur in the "context of assault" (People v. Hansen, supra, 9 Cal.4th at pp. 311, 312, 36 Cal. Rptr.2d 609, 885 P.2d 1022), allowing felonious assaults to serve as predicates for felony murder would "usurp most of the law of homicide" (id. at p. 311, 36 Cal. Rptr.2d 609, 885 P.2d 1022) in derogation of the legislative intent. Thus, the critical fact in Hansen was that "[m]ost homicides do not result from violations of section 246." (Id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Since relatively few homicides are caused by malicious and willful discharge of a firearm at an inhabited dwelling, allowing that offense to support a conviction of felony murder would not "effectively eliminat[e] the requirement of malice" (id. at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022), "preserving some meaningful domain in which the Legislature's careful gradation of homicide offenses can be implemented" (id. at p. 312, 36 Cal.Rptr.2d 609, 885 P.2d 1022).[3]
Another relevant factor remains that of deterrence. Deterrence in the felony murder context has two facets: deterrence of killings and deterrence of felonies. (Roth & Sundby, The Felony-Murder Rule: A Doctrine at Constitutional Crossroads (1985) 70 Cornell L.Rev. 446, 450-451.) "[D]eterrence of negligent or accidental killings in the course of the commission of dangerous felonies" (People v. Hansen, supra, 9 Cal.4th at p. 310, 36 Cal. Rptr.2d 609, 885 P.2d 1022) is the "fundamental" (ibid.) and "traditionally recognized" (id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022) purpose of the felony-murder rule. (See, e.g., People v. Wilson, supra, 1 Cal.3d at p. 440, 82 Cal.Rptr. 494, 462 P.2d 22; People v. Washington (1965) 62 Cal.2d 777, 781, 44 Cal.Rptr. 442, 402 P.2d 130.) In this respect, the rule "encourages the felon to commit the felony 'more carefully' with regard to human life, to make sure that a homicide does not occur." (Comment, Merger and the California Felony-Murder Rule (1972) 20 UCLA L.Rev. 250, 258, fn. 41.) Deterrence of the felony itself is a more controversial aim; some opinions endorse the use of homicide law for this purpose, others do not. (Compare People v. Mattison, supra, 4 Cal.3d at p. 185, 93 Cal.Rptr. 185, 481 *366 P.2d 193 [felony-murder rule "should have some effect on the defendant's readiness to [commit the felony"]]; People v. Taylor, supra, 11 Cal.App.3d at p. 63, 89 Cal.Rptr. 697; People v. Patterson (1989) 49 Cal.3d 615, 627, 629, 262 Cal.Rptr. 195, 778 P.2d 549 (cone. & dis. opn. of Lucas, C.J.) ["the purpose of the felony-murder rule is to deter the commission of inherently dangerous felonies"]; People v. Washington, supra, at p. 785, 44 Cal.Rptr. 442, 402 P.2d 130 (dis. opn. of Burke, J.) with People v. Smith, supra, 35 Cal.3d at p. 807, 201 Cal.Rptr. 311, 678 P.2d 886 ["the ostensible purpose of the felony-murder rule is not to deter the underlying felony"]; People v. Washington, supra, at p. 781, 44 Cal.Rptr. 442, 402 P.2d 130.)
Both forms of deterrence are cited in Hansen, in connection with the issue of inherent danger (People v. Hansen, supra, 9 Cal.4th at pp. 310-311, 36 Cal.Rptr.2d 609, 885 P.2d 1022) as well as that of merger (id. at pp. 314, 36 Cal.Rptr .2d 609, 885 P.2d 1022 [felony-murder rule should apply to felonies it is most likely to deter] 315 [deterrence of negligent or accidental killings].) However, the goal of felony deterrence receives greater emphasis in the discussion of inherent danger than in the discussion of merger. (See id. at p. 311, 36 Cal.Rptr.2d 609, 885 P.2d 1022 [citing "enormous concern to the public" and "climate of fear" created by "reprehensible" and "alarmingly common" use of firearms]; accord People v. Clem, supra, 78 Cal. App.4th at p. 351, 92 Cal.Rptr.2d 727.) Deterrence and danger go hand in hand when assessing the risks a felony poses the more dangerous the felony, the greater the need to deter it. However, since all dangerous felonies are well worth deterring, felony deterrence provides little basis for distinguishing between dangerous felonies that merge with resulting homicides and those that do not. Therefore, while both facets of deterrencediscouraging killings and feloniesremain relevant after Hansen, the felony-murder rule's traditional purpose of deterring killings is the more important consideration in applying the merger doctrine.
The final thread in the merger doctrine as reflected in Hansen is a concern with anomalous results. The Hansen court's reasons for refusing to apply the "integral part of the homicide" and "independent felonious design" tests for merger echoed prior cases that had sought to avoid results that were seen as "absurd" or irrational. (See People v. Washington, supra, 62 Cal.2d pp. 782-783, 44 Cal.Rptr. 442, 402 P.2d 130; cf. People v. Sears (1970) 2 Cal.3d 180, 189, 84 Cal.Rptr. 711, 465 P.2d 847.)

(b) Analysis

The central consideration in resolving the merger issue is whether most homicides result from grossly negligent discharge of a firearm in violation of section 246.3. As has been noted, that this offense is not a species of felonious assault is not controlling. If allowing section 246.3 violations to serve as predicate offenses may result in the felony-murder rule's application to a great majority of homicides, then the violations and resulting homicides must be deemed to merge, to prevent the rule from "effectively eliminating the requirement of malice" (People v. Hansen, supra, 9 Cal.4th at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022) in contravention of legislative intent.
Statistics compiled by the Attorney General indicate that a substantial majority of homicides in this state are committed with firearms. From 1994 to 2001, the number of homicides resulting from the use of firearms ranged from 67.5 to *367 75.8 percent annually.[4] All or substantially all of those deaths were presumably caused by shots fired (as opposed to bludgeoning with the weapon), and in every such instance the discharge of the firearm could be characterized as at least grossly negligent and prosecuted as a violation of section 246.3. As has been stated, the elements of the crime are: (1) willful discharge of a firearm; in a manner that (2) is grossly negligent and (3) could result in injury or death. (CALJIC No. 9.03.3.) The first element, "willful" discharge, is satisfied simply by a shot that is intentional, as opposed to accidental (see People v. Clem, supra, 78 Cal.App.4th at pp. 350-351, 92 Cal.Rptr.2d 727; CALJIC No. 1.20), and the third element, possible injury or death, will be satisfied whenever a person is shot and killed. The improper regard for life and the foreseeability of harm required for gross negligence (CALJIC No. 3.36) will also be manifest in every case, given the well known, lethal risks of shooting a gun, and the resulting death. Thus, a violation of section 246.3 can be charged whenever a gun is intentionally fired and a person is killed by the shotthe situation in the majority of homicides.
Therefore, to preserve malice as an issue in most homicide cases in accordance with legislative intent, we hold that the merger doctrine precludes a violation of section 246.3 from serving as a predicate offense for a charge of felony murder. Hansen is distinguished because the firearm offense in that case, malicious and willful discharge of a firearm at an inhabited dwelling, occurs in relatively few homicides, whereas the one here occurs in a great majority of them.
Respondent contends that allowing section 246.3 violations to act as predicates for felony murder will affect an even smaller percentage of cases than the offense considered in Hansen because "[h]omicides caused, ... by the discharge of a firearm that is grossly negligent but not willfully directed towards an inhabited dwelling or person must be even less frequent." However, a section 246 offense like the one in Hansen, unlike a section 246.3 offense, could not be charged in every fatal shooting; it could occur only in those cases where the killing resulted from shots fired at an inhabited dwelling. There will be cases where an intent to kill can be readily inferred from the circumstances of a fatal shooting, but gross negligence at the least could be charged even in such cases. Regardless of the circumstances, malice remains an element of the burden of proof for murder unless the felony-murder rule applies. Permitting that rule to potentially relieve the prosecution of that statutory burden in the majority of homicide cases would be contrary to the legislative intent. (People v. Hansen, supra, 9 Cal.4th at p. 311, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) For respondent to suggest that we should not be concerned, in setting the scope of the felony-murder rule, with the elimination of malice as an element of murder in most homicide cases because "[u]nder the felony-murder rule the People are not required *368 to prove malice" is to state an obvious point that ignores the core purpose of the merger doctrine: preserving the malice requirement (id. at p. 314, 36 Cal.Rptr.2d 609, 885 P.2d 1022) and with it a "meaningful domain in which the Legislature's careful gradation of homicide offenses can be implemented" (id. at p. 312, 36 Cal.Rptr.2d 609, 885 P.2d 1022).
The traditional "integral part of the homicide" and "independent felonious design" tests for merger, which may continue to play some limited role after Hansen, do not as applied here provide any definitive results that would dictate a contrary conclusion. Grossly negligent discharge of a firearm would likely be seen as an "integral part" of a resulting homicide because the discharge was the means by which the homicide was committed. (See People v. Smith, supra, 35 Cal.3d at p. 805, 201 Cal.Rptr. 311, 678 P.2d 886, discussing People v. Wesley (1970) 10 Cal.App.3d 902, 907, 89 Cal.Rptr. 377.) However, it could be argued that a violation of section 246.3 is not an "integral part" of a resulting homicide because the crime is complete when the firearm is discharged, regardless of any resulting damage. (See People v. Calzada (1970) 13 Cal.App.3d 603, 606, 91 Cal.Rptr. 912 [felony driving under the influence in violation of former Veh.Code, § 23105 did not merge with the resulting homicide because felony was complete when defendant began driving and was thus "distinct" and "independent" from homicide].) The "independent felonious design" test, which turns on the purpose of the defendant's actions, does not fit well with negligent conduct, and its outcome here would also be uncertain, given appellant's statements that he merely intended to frighten away the victims. (Compare People v. Hansen, supra, 9 Cal.4th at pp. 318, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (cone. opn. of Werdegar, J.) [defendant who discharged firearm at inhabited dwelling had independent felonious design of intimidating occupant] and 315, 36 Cal. Rptr.2d 609, 885 P.2d 1022 (maj. opn. [intimidation of occupant would be an independent purpose]) with id. at p. 330, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (cone. & dis. opn. of Kennard, J.) [defendant had no felonious purpose beyond mere assault].)
As for deterrence, felony-murder prosecutions based on grossly negligent discharge of a firearm would not further the felony-murder rule's original, fundamental purpose of "deter[ring] felons from killing negligently or accidentally" (People v. Washington, supra, 62 Cal.2d at p. 781, 44 Cal.Rptr. 442, 402 P.2d 130) because the felony itself is one of negligence. It makes no sense to speak of promoting careful gross negligence. (See Comment, supra, 20 UCLA L.Rev. at p. 278, fn. 148 [where felony "is one of negligence, the person cannot be encouraged by the felony-murder rule to commit the felony more carefully with regard to human life"].) It is true that use of grossly negligent discharge of a firearm as a predicate for felony murder would further the rule's other aim of deterring the felony itself, and this felony is clearly worth deterring. (People v. Clem, supra, 78 Cal.App.4th at p. 351, 92 Cal.Rptr.2d 727.) However, as has been indicated, deterrence of felonies is a less important consideration than deterrence of killings in deciding which inherently dangerous felonies merge with resulting homicides under the merger doctrine. Thus, without minimizing the great dangers associated with the discharge of firearms, we conclude that, on balance, considerations of deterrence do not militate against merger of this offense.
We note finally that a contrary ruling would produce the sort of absurd result the merger precedents have sought to avoid. If grossly negligent discharge of a firearm does not merge with a resulting *369 homicide, then defendants who say, "I didn't mean to do it" will in effect be pleading guilty to second degree felony murder in a majority of homicide cases. Defendants who admit an intent to kill, but claim to have acted with provocation or in honest but unreasonable self-defense, would likely have a stronger chance of being convicted of the lesser offense of voluntary manslaughter. There is no reason to think the Legislature intended that anomalous result when it enacted section 246.3 to discourage the "`practice of discharging firearms into the air during festive occasions'" (People v. Clem, supra, 78 Cal.App.4th at p. 350, 92 Cal.Rptr.2d 727), much less that it contemplated the far reaching revision of the homicide laws that would be accomplished by an extension of the felony-murder rule to that offense (see People v. Taylor, supra, 11 Cal.App.3d at pp. 62, fn. 3, 89 Cal.Rptr. 697 [stating, before enactment of § 246.3, that "[n]o one has ever contended that death resulting from the negligent discharge of a firearm supports anything but a conviction for involuntary manslaughter"]).
Accordingly, it was error to instruct the jury that it could convict appellant of second degree felony murder if it found that he had violated section 246.3.
We recognize that Division One of this Appellate District has just reached the opposite conclusion on the merger issue in (People v. Randle (2003) 109 Cal.App.4th 313, 134 Cal.Rptr .2d 670). For the foregoing and following reasons, we respectfully disagree with the decision in that case.
We concur with Randle that the "first issue in applying the principles set out in Hansen is whether most homicides result from violations of section 246.3." (People v. Randle, supra, 109 Cal.App.4th at p. 326, 134 Cal.Rptr.2d 670.) However, the court's subsequent observation that section 246.3 violations do not generally result in homicide is irrelevant, and states the test backward: most assaults do not result in homicide, either, but the offense merges because most homicides involve an assault.
Randle reasons that section 246.3 will be implicated in relatively few homicides from discharges of firearms, by interpreting the word "could" in section 246.3 to mean "unlikely." Section 246.3 applies to firearm discharges "which could result in injury or death to a person." Randle ventures that, had this statute existed at the time of the offense in Ireland it would not have been violated in that case because the fatal shots were fired at point-blank range. The opinion posits that "there would have been no factual basis for charging the Ireland defendant with a violation of section 246.3" because "the firing of shots at the victim from a close range was not a crime that could result in injury or death: It was a crime likely to result in injury or death." (People v. Randle, supra, 109 Cal.App.4th at p. 328, 134 Cal.Rptr.2d 670.) The court goes on to express its "expectation that trial courts will recognize this distinction and instruct accordingly," and to admonish the People to refrain from "manipulation" in charging section 246.3 violations to secure felony-murder convictions. (Randle, supra, at p. 328, 134 Cal.Rptr.2d 670.)
The attempt to limit the application of section 246.3 to shootings that are unlikely to result in injury or death is at odds with the ordinary meaning of the word "could," and with the conclusion, drawn in People v. Clem, supra, 78 Cal. App.4th 346, 92 Cal.Rptr.2d 727 and accepted in Randle (People v. Randle, supra, 109 Cal.App.4th at p. 326, 134 Cal.Rptr.2d 670), that section 246.3 is an inherently dangerous felony. Words in a statute are given their usual and ordinary meaning unless another meaning is clearly intended or indicated. (People v. Trevino (2001) 26 Cal.4th 237, 241, 109 Cal.Rptr.2d 567, 27 *370 P.3d 283; People v. Loeun (1997) 17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776, 947 P.2d 1313; Estate of Richartz (1955) 45 Cal.2d 292, 294, 288 P.2d 857.) The term "could" ordinarily connotes an "ability" or a "possibility." (See American Heritage Diet. (4th ed.2000) pp. 269, 416 [defining "can" and "could"].) There is no basis to believe that the word "could" as used in section 246.3 has any uncommon meaning, much less that it means "unlikely" as construed in Randlea meaning that would be contrary to its usual connotation.
We interpreted the word "could" in section 246.3 in its ordinary sense in People v. Clem, supra, 78 Cal.App.4th 346, 92 Cal.Rptr .2d 727, in concluding that the felony was inherently dangerous to human life. The words "could result in injury or death to a person" were found to limit section 246.3 only insofar as they "presuppose[d] that there [were] people in harm's way" (Clem, supra, at p. 351, 92 Cal. Rptr.2d 727), and that "the defendant's act `actually had the potential for culminating in personal injury or death'" (id. at pp. 351-352, 92 Cal.Rptr.2d 727, quoting People v. Alonzo (1993) 13 Cal.App.4th 535, 539, 16 Cal.Rptr.2d 656 [italics added].) Given the possibility of harm contemplated by the statute, and the "imminent deadly consequences ... inherent in the act" of discharging a firearm (Clem, at p. 353, 92 Cal.Rptr.2d 727), we found the offense to be inherently dangerous. Although Randle agrees with that conclusion, the felony's inherent danger would not be apparent if, as Randle submits, the statute applied only when harm is unlikely. (See Clem, at p. 349, 92 Cal.Rptr.2d 727 [felony is inherently dangerous only if it "`cannot be committed without creating a substantial risk that someone will be killed'"].)
Therefore, as we have said, every fatal shooting involves at least a potential violation of section 246.3; if there is a dead body, the shot was certainly one that "could result in injury or death to a person." We also remain convinced that, contrary to Randle's assertions, felony murder prosecutions based on section 246.3 violations will not further the traditional purpose of the felony-murder rule inasmuch as one cannot encourage careful gross negligence.

(4) Prejudice

It seems unlikely that the jury would have convicted appellant of murder based on mere gross negligence in view of the evidence that he emptied his weapon and fired some ten shots toward the victims. However, erroneous allowance of a felony-murder theory "require[s] reversal of defendant's murder conviction unless it appears beyond a reasonable doubt that the instructional error did not contribute to the jury's verdict. (People v. Swain (1996) 12 Cal.4th 593, 607, 49 Cal.Rptr.2d 390, 909 P.2d 994; People v. Smith (1998) 62 Cal.App.4th 1233, 1238, 72 Cal.Rptr.2d 918.) `Such a reasonable doubt arises where, although the jury was instructed on alternate theories, there is no basis in the record for concluding that the verdict was based on a valid ground.' [Citations.]" (People v. Sanchez (2001) 86 Cal.App.4th 970, 980, 103 Cal.Rptr.2d 809; see also People v. Flores (1992) 7 Cal.App.4th 1350, 1360, 9 Cal.Rptr.2d 754 ["`reversal is required only if the reviewing court cannot determine from the record on which theory the jury relied'"].)[5]
*371 Respondent submits that the error was harmless in this case because there is no basis to distinguish appellant's intent toward the two victims, Riley and Harris, and the conviction of assault for the wounding of Harris shows that the conviction of murder for the killing of Riley must have rested on something more than a finding of negligence. Respondent relies on People v. Flores, supra, 7 Cal.App.4th 1350, 9 Cal.Rptr.2d 754, where the defendant was convicted of second degree murder and two counts of attempted murder based on a series of shots fired by a fellow gang member that killed one person and injured two others. There was "Ireland error" in connection with the murder count because the jury was instructed that it could convict the defendant of second degree felony murder if it found that the killing occurred in an assault with a firearm. However, the error was harmless in view of the convictions of attempted murder of the other victims. Since the jury was told the crime of attempted murder requires express malice, it must have found that there was an intent to kill the victims who survived (id. at p. 1361, 9 Cal.Rptr.2d 754), and that same intent must have extended to the victim who was killed: "`The evidence manifestly show[ed] a single intent as to all three victims in the ... shootings; it is inconceivable the jury would find that [the accomplice] intended to kill only the victims who survived, but not the one who died'" (ibid., quoting People v. Walker (1988) 47 Cal.3d 605, 634, 253 Cal.Rptr. 863, 765 P.2d 70). Thus, in Sanchez, since the record established that the second degree murder conviction must have rested on a finding of express malice, it was immaterial whether it could also have rested on a theory of felony murder. Similarly here, the argument is that because the jury found that appellant "willfully shot Rickey Harris ... the shot that killed Kehinde Riley must have also been willful," and the jury must have determined that "there was nothing negligent about the shooting."
Appellant was not convicted of (or charged with) Harris's attempted murder, but only of assaulting Harris. We therefore face a different issue than the one in Sanchez: comparing the state of mind in an assault with that of gross negligence.
The jury was instructed pursuant to the 1998 revision of CALJIC No. 9.00 that it was necessary, in order to prove an assault, that: "1. A person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another person; and [¶] 2. At the time the act was committed the person intended to use physical force upon another person or to do an act that was substantially certain to result in the application of physical force upon another person; and [¶] 3. At the time the act was committed the person had the present ability to apply physical force to the person of another. [¶] `Willfully' means that the person committing the act did so intentionally. [¶] To constitute an assault it is not necessary that any actual injury be inflicted. However, if an injury is inflicted it may be considered in connection with other evidence in determining whether an assault was committed and, if so, the nature of the assault." (Italics *372 added.) The Comment on this revision of the standard assault instruction indicated that the language we have italicized was based on People v. Smith (1997) 57 Cal. App.4th 1470, 67 Cal.Rptr.2d 604. The Comment stated: "It is not known whether this holding will be required only when defendant claims he or she did not intend to injure the victim or whether it will have a more general application. It is a matter the trial court will have to consider."
The Smith case explains at some length why paragraph 2 in the 1998 revision of CALJIC No. 9.00 describes a more culpable mental state than those associated with negligent or even reckless conduct. The defendant in Smith was charged with assault with a deadly weapon on a peace officer, and his intent in the incident was at issue. The jury was instructed in pertinent part that an assault requires an intent "to commit an act, the direct, natural and probable consequences of which if successfully completed would be the application of physical force upon the person of another." (People v. Smith, supra, 57 Cal. App.4th at pp. 1477, fn. 4, 1478, fn. 5, 67 Cal.Rptr.2d 604.) In the Smith court's view, this instruction was deficient because it permitted an assault conviction to be based on mere criminal negligence, "regardless whether the defendant intended a battery. [¶] `Liability for [the] natural and probable consequences [of an intended act] is regarded as legally equivalent to liability for reasonably foreseeable consequences, and is another way of expressing liability for negligence.'" (Id. at p. 1479, 67 Cal. Rptr.2d 604.) Since "recklessness is not sufficient to establish an assault ... [and] recklessness transcends negligence," it "follow[ed] that criminal negligence is not sufficient to establish an assault," and thus that the instruction was erroneous. (Id. at p. 1480, 67 Cal.Rptr.2d 604.)
The Smith court thought that an assault required "an `"intent to cause [some] injury" '" (People v. Smith, supra, 57 Cal. App.4th at p. 1488, 67 Cal.Rptr.2d 604), with "intent" defined in accordance with "traditional view[s]" (id. at p. 1485, 67 Cal.Rptr.2d 604) as a "desire to cause a consequence of an act or belief the consequence is substantially certain to result" (id. at p. 1486, fn. 10, 67 Cal.Rptr.2d 604). In layman's terms, "substantially certain to result" means "`bound to happen.'" (Id. at p. 1486, 67 Cal.Rptr.2d 604, italics omitted.) For example, if A, trying to kill B, throws a bomb into B's office knowing that B and C are there, A is deemed to intend harm to C as well as B. (Id. at p. 1487, 67 Cal.Rptr.2d 604.) Situations involving such "ascribed intention" (id. at p. 1485, 67 Cal.Rptr.2d 604) are relatively rare "since almost always a person who foresees an illegal consequence as the virtually inevitable result of his act will desire it," at least as a means to an end. (Id. at p. 1487, 67 Cal.Rptr.2d 604.)
The intent-to-injure standard for assault thus described in Smith, and embodied in the 1998 revision of CALJIC No. 9.00, is not one of merely negligent (People v. Smith, supra, 57 Cal.App.4th at p. 1488, 67 Cal.Rptr.2d 604), or even reckless, conduct. Smith pointed out the "distance between conduct which is known to be inherently dangerous, i.e., conduct which carries with it a risk that an injury will ensue, and conduct which is known to have the consequence that an injury is `bound to happen.' Intentional conduct risking injury is deemed reckless, which carries with it a subjective appreciation of the risk akin to implied malice in the law of murder. [Citation.] Reckless conduct `resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than substantial certainty.'" (Id. at p. 1487, 67 Cal. Rptr.2d 604, fn. omitted.)
*373 Therefore, under the instructions given in this case,[6] the jury must have concluded in convicting appellant of assaulting Harris that appellant intended to harm Harris, in the sense that "intent" has traditionally been defined in the law, by intending to use force on him or to do an act that was substantially certain to result in the application of such force. In so concluding, the jury must have rejected appellant's defense, to the charge of murder as well as assault that he was only trying to frighten the victims when he fired the shots. (People v. Flores, supra, 7 Cal.App.4th at p. 1361, 9 Cal.Rptr.2d 754 [evidence showed single intent toward victims].) As to the murder charge, if the force appellant intended to apply against Riley was lethal force, then he was guilty of murder with express malice (§ 188 [intent to kill]); if the force was intended only to injure, then he was guilty of murder with implied malice (People v. Thomas (1953) 41 Cal.2d 470, 479, 261 P.2d 1 (cone. opn. of Traynor, J.); People v. Protopappas (1988) 201 Cal. App.3d 152, 172, 246 Cal.Rptr. 915); in either event, he was not guilty merely of grossly negligent discharge of a firearm (People v. Watson (1981) 30 Cal.3d 290, 296-297, 179 Cal.Rptr. 43, 637 P.2d 279 [distinguishing implied malice from gross negligence; former involves "a higher degree of culpability" and "awareness of a higher degree of risk"]; People v. Smith, supra, 57 Cal.App.4th at p. 1488, 67 Cal. Rptr.2d 604 [distinguishing intent defined in CALJIC No. 9.00 (1998 rev.) from recklessness].) Thus, the murder conviction was necessarily based on a valid ground and the erroneous instruction on felony murder was harmless. (People v. Sanchez, supra, 86 Cal.App.4th at p. 980, 103 Cal. Rptr.2d 809; People v. Flores, supra, 7 Cal.App.4th at p. 1360, 9 Cal.Rptr.2d 754.)[7]
B.-C.[**]

III. DISPOSITION
The judgment is affirmed.
I concur: RIVERA, J.
REARDON, J.
I concur in the judgment affirming appellant's convictions. We correctly find that any error in instructing on felony murder to be harmless. Because our judgment of affirmance is not dependent upon resolution of the merger issue, it is unnecessary, in my opinion, to address the *374 merits of this issue and I decline, therefore, to do so.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.B and II.C.
[1] It is unclear from appellant's statements whether he heard the shot or backfire before or after he finished shooting. When the subject was first broached in the initial interview, it appeared from the sequence of questions that he did not "c[o]me down a little further off my stairs and sho[o]t in the air" until after he heard the shot or backfire. During the second interview, the following exchanges occurred: "Q. Did [hearing the shot or backfire] happen before you fired the shots? [¶] A. No, that, that's after they started running. [¶] Q. Ok. So, you'd already fired 5 shots by that point? [¶] A. Yes... . [¶] ... [¶] Q. [S]o that I'm clear, you fired, you remember at least 5 shots? [¶] A. Yes. [¶] Q. And, you fired all 5 of those shots when you heard some type of backfire or a possible shot, right? [¶] A. Yes, yes. [¶] ... [¶] Q. So you didn't see them with any weapons? [¶] A. No. I don't, I don't recall seeing no, no weapons. I don't even know if they had weapons ... I can't say. All I know when they took off there was like a backfire or a shot, I, I, that's all I know."
[2] All further statutory references are to the Penal Code.
[3] Picking up on language in Taylor that distinguished the assault offense in Ireland, the Hansen majority added, with respect to legislative intent, that it was not faced with "a situation in which the Legislature has demanded a showing of actual malice" to support a murder conviction. (People v. Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) The "demand" that controlled in Ireland was not an explicit legislative pronouncement (the homicide statutes do not expressly refer to assaults), but was instead implicit in the statutory scheme for homicide offenses: Having set up that scheme, the Legislature presumably would not want it bypassed in a majority of cases through felony murder prosecutions for assaults. Thus, we do not interpret legislative "demand[s]," as the term is used in Hansen, to mean anything other than a presumed legislative desire to preserve the statutory gradation of offenses in most homicide cases.
[4] The California Department of Justice's annual publication "Homicide in California" has reported the following percentages of homicides resulting from firearm use: 75.8 percent in 1994; 74.0 percent in 1995; 71.7 percent in 1996; 72.3 percent in 1997; 68.8 percent in 1998; 67.5 percent in 1999; 70.4 percent in 2000; and 72.2 percent in 2001. (Cal. Dept. of Justice, Bur. of Crim. Information & Analysis, Homicide in California, ann. reps. 1994-2001, p. 18 each ann. rep.) For purposes of these reports, "homicide" is defined as the "willful (nonnegligent) killing of one human being by another," a category that includes "[m]urder and nonnegligent manslaughter. Attempted murder, justifiable homicide, manslaughter by negligence, and suicide are excluded."
[5] Respondent argues, citing People v. Lasko (2000) 23 Cal.4th 101, 111, 96 Cal.Rptr.2d 441, 999 P.2d 666, that prejudice from an erroneous instruction on felony murder is evaluated under the standard of People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243, and thus that reversal is required only if it appears reasonably probable that the error affected the outcome of the case. However, Lasko involved failure to properly instruct on a lesser included offense, not erroneous instruction on the elements of an offense, where the harmless-beyond-a-reasonable-doubt standard of Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, has been applied. (People v. Swain, supra, 12 Cal.4th at p. 607, 49 Cal.Rptr.2d 390, 909 P.2d 994.) We can assume without deciding, for purposes of this opinion and consistent with Swain and Sanchez,
 that Chapman is applicable here.
[6] Since appellant's jury was instructed on the intent for assault according to Smith, it is immaterial for present purposes: that Smith may have been inconsistent with People v. Colantuono (1994) 7 Cal.4th 206, 26 Cal. Rptr.2d 908, 865 P.2d 704 (see People v. Smith, supra, 57 Cal.App.4th at p. 1488, 67 Cal.Rptr.2d 604 [acknowledging possible inconsistency] ); that Smith may have been disapproved in People v. Williams (2001) 26 Cal.4th 779, 111 Cal.Rptr.2d 114, 29 P.3d 197 (see People v. Wright (2002) 100 Cal.App.4th 703, 705, 123 Cal.Rptr.2d 494 [noting that Williams is at odds with Smith]), and that CALJIC No. 9.00 has been revised, in light of Williams, to delete paragraph 2 of the 1998 revision on which we rely and to provide that "an assault does not require an intent to cause injury" (CALJIC No. 9.00 (2002 rev.)).
[7] The jury's questions to the court during deliberations comport with this conclusion. The questions sought assistance in understanding the role of malice in determining the nature of a homicide, and in understanding the differences between first degree and second degree murder. The jury requested clarification of the meaning of the phrases "`deliberate and premeditated' versus `intentional killing'" and also asked for additional explication of CALJIC instructions 8.20 (deliberate and premeditated murder), 8.30 (unpremeditated murder of the second degree) and 8.31 (second degree murderkilling resulting from unlawful act dangerous to life).
[**] See footnote *, ante.